Sam S. KING, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.

No. CIV.A. H035472.

United States District Court,
S.D. Texas,
Houston Division.

March 17, 2005.

Victor N. Makris, Attorney at Law, Bellaire, for Sam S. King, Plaintiff.

Cheryl Latrice Chapman, Office of the General Counsel, Social Security Admin., Kerry J. Simpson, U.S. Atty's Off, Special Assistant U.S. Atty, Dallas, for Jo Anne B. Barnhart Commissioner of The Social Security Administration, Defendant.

## MEMORANDUM AND ORDER

BOTLEY, United States Magistrate Judge.

Pending before the Court are Plaintiff Sam S. King's ("King") and Defendant Jo

Anne B. Barnhart's, Commissioner of the Social Security Administration (the "Commissioner"), cross-motions for summary judgment. King appeals the determination of the Administrative Law Judge ("ALJ") that he is not entitled to disability insurance benefits under Title II of the Social Security Act ("the Act"). *See* 42 U.S.C. § 405(g). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, this Court is of the opinion that King's Motion for Summary Judgment (Docket Entry No. 12) should be denied, the Commissioner's Motion for Summary Judgment (Docket Entry No. 14) should be granted, and the ALJ's decision denying benefits should be affirmed.

## I. *Background*

On July 18, 2001, King filed an application for disability insurance benefits under Title II of the Social Security Act, alleging disability beginning on October 1, 1990, as a result of post traumatic stress disorder[1] ("PTSD"), diabetes, shrapnel in his back and left leg, and insomnia.[2] (R. 15, 103).

After being denied benefits initially and on the reconsideration levels, King requested an administrative hearing before an ALJ to review the decision. (R. 9–10). A hearing was held on December 19, 2002, at which time the ALJ heard testimony from King and Philip Roddy ("Roddy"), a vocational expert ("VE"). (R. 14, 23–70). In a decision dated May 7, 2003, the ALJ denied King's application for benefits. (R. 11–21). King appealed the decision to the Appeals Council of the Social Security Administration's ("SSA") Office of Hearings and Appeals, which on October 10, 2003, found no basis for granting a request for review. (R. 5–8). Therefore, the ALJ's determination became the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000).

King filed this case on December 1, 2003, contesting the Commissioner's denial of his claim for benefits. *See* Docket Entry No. 1.

## II. *Analysis*

### A. *Statutory Bases for Benefits*

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F.2d 1005, 1007 n. 1 (5th Cir.1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir.1997). Here, King stopped working in 1990. (R. 15, 112). Consequently, King's Title II insured status expired five years later on March 31, 1995. *See* 20 C.F.R. § 404.131. Thus, to be eligible for benefits, King must establish disability on

---

1. "Post-traumatic stress disorder" is an anxiety disorder caused by exposure to an intensely traumatic event; characterized by reexperiencing the traumatic event in recurrent intrusive recollections, nightmares, flashbacks, by avoidance of trauma-associated stimuli, by generalized numbing of emotional responsiveness, and by hyperalertness and difficulty in sleeping, remembering, or concentrating. The onset of symptoms may be delayed for months after the event. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 531 (29th ed. 2000).

2. "Insomnia" is the inability to sleep; abnormal wakefulness. *See* DORLAND'S, *supra*, at 903.

or before his date of last insured ("DLI") of March 31, 1995.

Applicants seeking benefits under this statutory provision must prove "disability" within the meaning of the Act. See 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a). Under Title II, disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

### B. *Standard of Review*

#### 1. *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir.1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir.2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See*

*Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir.2000).

#### 2. *Administrative Determination*

■ Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir.2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Masterson*, 309 F.3d at 272; *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.1999).

■ When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir.2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir.2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir.2001).

The court may not, however, reweigh the evidence, try the issues *de novo,* or substitute its judgment for that of the Commissioner. *See Masterson,* 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.*

### C. *ALJ's Determination*

■ An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 404.1520(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 404.1520(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 404.1520(d).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 404.1520(e).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel,* 209 F.3d 448, 453 (5th Cir.2000); *accord Boyd,* 239 F.3d at 704–05. The claimant has the burden to prove disability under the first four steps. *See Myers,* 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner at step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson,* 309 F.3d at 272; *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994), *cert. denied,* 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his existing impairments, the burden shifts back to the claimant to prove that he cannot, in fact, perform the alternate work suggested. *See Boyd,* 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

■ The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan,* 954 F.2d 289, 293 (5th Cir.1992). An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act. *See Newton,* 209 F.3d at 452; *Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir.1990); *Johnson v. Bowen,* 864 F.2d 340, 343 (5th Cir.1988); *Cook v. Heckler,* 750 F.2d 391, 393 (5th Cir.1985). A claimant is deemed disabled under the Act only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel,* 238 F.3d 592, 594 (5th Cir.2001); *accord Newton,* 209 F.3d at 452; *Crowley v. Apfel,* 197 F.3d 194, 197–98 (5th Cir.1999); *Selders,* 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for

pay or profit. *See Newton,* 209 F.3d at 452–53; *see also* 20 C.F.R. § 404.1572(a)-(b).

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler,* 707 F.2d 162, 165 (5th Cir.1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if he impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" *Greenspan,* 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker,* 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1. Claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits through March 31, 1995 only.

2. Claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's status post shrapnel wounds in left leg, during the period on or before March 31, 1995, is a severe impairment, based on the requirements in the Regulations (20 C.F.R. § 404.1521).

4. This medically determinable impairment did not and does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations during the relevant period before March 31, 1995 are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment during the relevant period before March 31, 1995 (20 C.F.R. § 404.1527).

\* \* \* \* \* \*

8. Claimant's past relevant work as operator in an oil refinery and fork-lift operator did not require the performance of work-related activities precluded by his residual functional capacity (20 C.F.R. § 404.1565).

9. The claimant's medically determinable status post shrapnel wounds in left leg did not during the relevant period on or before March 31, 1995, prevent the claimant from performing his past relevant work.

(TR. 20–21). As to the fifth step, the ALJ concluded:

7. Claimant had during the relevant period on or before March 31, 1995, the following residual functional capacity: full range of medium work.

\* \* \* \* \* \*

10. Claimant was not under a "disability" as defined in the Social Security Act, at any time through March 31, 1995, his date last insured (20 C.F.R. § 404.1520(f)).

(TR. 21).

■ This court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See*

*Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 215; *Myers,* 238 F.3d at 619; *Newton,* 209 F.3d at 452; *Greenspan,* 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny King's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history. *See Martinez v. Chater,* 64 F.3d 172, 174 (5th Cir.1995); *Wren v. Sullivan,* 925 F.2d 123, 126 (5th Cir.1991) (citing *DePaepe v. Richardson,* 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton,* 209 F.3d at 452; *Brown,* 192 F.3d at 496; *Martinez,* 64 F.3d at 174; *Selders,* 914 F.2d at 617.

### D. *Issues Presented*

King contends that substantial evidence does not support the findings of the ALJ. Specifically, King argues that the ALJ erred by failing to consider a retrospective diagnosis of PTSD and render a retrospective assessment of severity. *See* Docket Entry No. 13. Additionally, King claims that the ALJ failed to properly support his assessment of King's residual functional capacity. *See id.* The Commissioner contends that the ALJ's findings are supported by substantial evidence. *See* Docket Entry No. 15.

### E. *Retrospective Diagnosis*

■ As King's Title II insured status expired on March 31, 1995, he must establish that he became disabled on or before that date to be eligible for benefits. *See Barraza v. Barnhart,* 61 Fed.Appx. 917, 2003 WL 1098841, at *1 (5th Cir.2003) (citing *Ivy v. Sullivan,* 898 F.2d 1045, 1048 (5th Cir.1990)). "Evidence showing a degeneration of a claimant's condition after the expiration of his Title II insured status is not relevant to the Commissioner's Title II disability analysis." *See id.* (citing *Torres v. Shalala,* 48 F.3d 887, 894 n. 12 (5th Cir.1995)). An ALJ, however, "may not refuse to consider retrospective medical diagnoses uncorroborated by contemporaneous medical reports but corroborated by lay testimony." *Id.* (citing *Likes v. Callahan,* 112 F.3d 189, 190–91 (5th Cir.1997)). In recognizing the delayed onset of PTSD, the Fifth Circuit observed that " 'PTSD is an unstable condition that may not manifest itself until well after the stressful event which caused it, and may wax and wane after manifestation.' " 112 F.3d at 191 (quoting *Jones v. Chater,* 65 F.3d 102, 103 (8th Cir.1995)).

A review of the medical records submitted in connection with King's administrative hearing reveals that in 1971, during his service in Vietnam, King received shrapnel wounds in his left leg. (R. 280). In February 1975, King was admitted to the Veterans Administration ("VA") Hospital in Houston, Texas, complaining of depression and tension associated with scars on his left leg, which were from his previous shrapnel wounds. (R. 179–183). No clear psychiatric illness was identified at that time. (R. 179). He was treated for his physical problems (*i.e.,* removal of a lipoma) and recommended for treatment for his scars. (R. 180–183). In April 1978, King was admitted to the VA Hospital because he was vomiting blood after a "heavy drinking episode." (R. 184–185). He was treated for alcoholic gastritis.[3] (R.

---

**3.** "Alcoholic gastritis" is an inflammation of the stomach pertaining to or containing alcohol. *See* DORLAND'S, *supra,* at 730.

184–185). At that time, his diagnoses included a possible upper gastrointestinal bleed, secondary to post peptic ulcer disease[4] and alcoholic hepatitis.[5] (R. 185). He was released two days after admission. (R. 184–185).

In May 1992, despite complaints of severe pain in his leg, medical examinations revealed King to hold a VA disability rating[6] of 10% for his shrapnel wounds. (R. 170–177, 285–286). In May 1992, King's shrapnel wounds were described by Brain Coleman, M.D. ("Dr. Coleman") as "moderately symptomatic." (R. 284). King also had degenerative arthritis in his lower back that Dr. Coleman described as "mildly symptomatic" (R. 284). King did not complain of lower back impairment or pain in a subsequent examination performed on November 15, 2000. (R. 209–212). King was still rated 10% disabled in June 2000. (R. 239). At some point, his disability was increased to 30% (R. 173), and to 50% by November 2000. (R. 206).

Medical records also reveal King as having other ailments, such as diabetes, for which he was first diagnosed in August 1999, and treated with oral medication. (R. 278–279).

On June 12, 2000, Marcia Adelson, M.D. ("Dr. Adelson"), reported in a Compensation and Pension Exam administered to King for PTSD that King stated he had trouble sleeping, experienced frequent nightmares of combat experiences and would sometimes wake up and hit his wife without reason. (R. 246–251). King also claimed that "when there was lightning, he cannot stand it, he will turn the steering wheel loose, he does not like crowds, [and] he has never sought treatment." (R. 246). Dr. Adelson diagnosed King with a cognitive disorder, not otherwise specified, PTSD, alcohol abuse in sustained remission, diabetes mellitus, and status post gunshot wound. (R. 251). He also evaluated King with a Global Assessment of Functioning ("GAF") of 55.[7] (R. 251).

In VA outpatient notes dated June 22, 2000, and July 13, 2000, however, King was evaluated with a GAF of 50.[8] (R. 241). By August 3, 2000, VA outpatient notes reported that was anxious and depressed with an impaired cognition and a GAF rating of 40.[9] (R. 223–225). On November 16, 2000, King's GAF rating was re-

---

**4.** "Peptic ulcer" disease consists of an ulceration of the mucous membrane of the esophagus, stomach, or duodenum, caused by the action of gastric juice. *See* DORLAND'S, *supra*, at 1907.

**5.** "Alcoholic hepatitis" consists of liver inflammation resulting from alcoholism, often a precursor of cirrhosis of the liver. *See* DORLAND'S, *supra*, at 808.

**6.** "A VA rating of total and permanent disability is not legally binding on the Commissioner because the criteria applied by the two agencies is different, but it is evidence that is entitled to a certain amount of weight and must be considered by the ALJ." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir.2001) (citing *Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir.2000)).

**7.** A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM–IV–TR") 32 (4th ed.2000). The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning—*e.g.*, 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores signify more serious symptoms. A GAF rating of 55 indicates a "moderate" impairment in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or coworkers). *See id* at 34.

**8.** A GAF rating of 50 indicates a "serious" impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *See* DSM–IV–TR, *supra*, at 34.

**9.** A GAF rating of 40 indicates some impairment in reality testing or communication (*e.g.*, speech is at time illogical, obscure, or irrele-

ported as 39.[10] (R. 204). Hence, in a VA rating decision dated December 16, 2000, the VA increased King's disability rating to 100%, effective February 17, 2000, due to evidence of total occupational and social impairment. (R. 173–76). Symptoms that indicated such an impairment included: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living including personal hygiene; disorientation to time and place; and, memory loss of names or close relatives, own occupation, or own name. (R. 176). Outpatient notes from the VA in 2001, continued to report King's as having serious mental impairments with GAF ratings in the 40's. (R. 187, 198)

On November 19, 2001, Manizeh Mirza–Gruber, M.D. ("Dr. Mirza–Gruber") conducted a consultative psychiatric examination on King for the SSA. (R. 302–307). Dr. Mirza–Gruber reported that King described himself as nervous, upset, and irritable and that he was experiencing intermittent insomnia, increased weight, poor appetite, decreased concentration, and increased forgetfulness of items, people's names, and directions causing him to be unable to drive in a car by himself. (R. 302). It was further noted that King complained of decreased energy and fatigue,

mild anhedonia,[11] decreased libido, feelings of helplessness, worthlessness, and guilt and some passive suicidal thoughts but no active plan. (R. 302). Dr. Mirza–Gruber diagnosis of King included, a history of PTSD, a cognitive disorder, not otherwise specified, and major depressive disorder,[12] chronic, moderate, with no psychotic features, and a history of alcohol abuse in full remission. (R. 305). Dr. Mirza–Gruber evaluated King with a GAF of 55, with a fair prognosis with treatment. (R. 306).

In a VA rating decision dated August 15, 2002, the VA continued King's 100% disability status based on his diagnosis of PTSD. (R. 172).

■ In the case at bar, there is substantial evidence in the record to support the ALJ's determination that King suffered from an impairment which did not meet or equal the requirements of a listing. The medical records indicate that King had, at or before March 31, 1995, status post shrapnel wounds in his left leg (R. 177, 293), an impairment that was severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. Such wounds, however, are not "listed" impairments. (R. 18). Additionally, King's degenerative disease in his lower back did not meet the requirements of listing 1.04[13]

vant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.,* depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children is defiant at home, and is failing at school). *See* DSM–IV–TR, *supra,* at 34.

10. A GAF rating of 39 falls within the "31 to 40" decile; thus, the assessment of impairment described in footnote 9, *supra,* applies. *See* DSM–IV–TR, *supra,* at 34.

11. "Anhedonia" is the total loss of feeling of pleasure in acts that normally give pleasure. *See* DORLAND's, at 89.

12. "Depressive disorder" is a mood disorder in which depression is unaccompanied by manic or hypomanic episodes; *e.g.,* major depressive disorder and dysthymic disorder. *See* DORLAND's, *supra,* at 529.

13. Section 1.04 provides the requirements for disorders of the spine resulting in compromise of a nerve root or spinal cord with: evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg

because he showed no compromise of a nerve root or spinal cord and had none of the other manifestations required. (R. 296). With regard to his diabetes, King testified at the administrative hearing that he was experiencing problems with his vision, soreness in his feet, and frequent urination as a result of the disease. (R. 55–56). By King's own admission, he was not diagnosed with diabetes until 1999— after his DLI. (R. 55, 278–279). In evaluating King's physical impairments, state agency physicians John H. Durfor, M.D. and Jimmy Breazeale, M.D., concluded that King's claim should be "technically denied" because no medical evidence was provided to substantiate allegations of an impairment prior to King's DLI of March 31, 1995. (R. 322).

With regard to King's alleged mental impairment, the ALJ correctly concluded that King currently has PTSD, but there was no medical evidence stating this diagnosis or describing this impairment as having existed before his DLI of March 31, 1995. (R. 17). Indeed, in his decision, the ALJ summarized the scant records relating to impairments that pre-dated his DLI of March 31, 1995. In February 1975, King was admitted to the VA Hospital, complaining of depression and tension associated with pain from scars on his left leg—the shrapnel wounds. (R. 179). After several weeks of treatment, Archie Blackburn, M.D., made the following report:

> Mental status was remarkable mainly for hypochondrical preoccupations, as well as passive aggressive personality features. There was no evidence of overt anxiety or depression, no disturbance of sensorium and no evident thought disorder.
>
> \*　　\*　　\*　　\*　　\*　　\*

raising test (sitting and supine). *See* 20

The patient did not involve himself in the milieu program but maintained complaints of somatic nature. The main theme of his complaints relate to his being disabled as a result of his war injuries. The patient was not motivated for a personality change, indeed no clearly psychiatric illness was identified although the patient manifested gastrointestinal symtomatology, hypochondrical trends, and passive aggressive personality features. Although the patient no doubt is experiencing [d]ifficulties in living and symptomatic anxiety at times, psychiatric treatment is not indicated unless he wishes to change himself in some way. An effort has been made to facilitate the patient's obtaining other appropriate medical evaluation and possible treatment and to communicate availability of psychiatric treatment facilities. The patient is ready for discharge from Psychiatry on a regular basis . . . .

(R. 179). King was treated for his physical problems (*i.e.*, removal of a lipoma) and recommended for treatment of his scars. (R. 180–183).

In April 1978, King was admitted to the VA Hospital due to vomiting blood after a "heavy drinking episode." (R. 184). King was treated for two days for alcoholic gastritis and released. (R. 184–185). The diagnoses resulting from this hospitalization were described as "possible upper gastrointestinal bleed, secondary to post peptic ulcer disease by history," "alcoholic gastritis, secondary to alcoholic abuse," and "alcoholic hepatitis." (R. 185).

As set forth, above, in November 2001, King was examined on a consultative psychiatric examination by Dr. Mirza–Gruber, who diagnosed King with a history of PTSD, a cognitive disorder, and major depressive disorder. (R. 305). Dr. Mirza–

C.F.R. pt. 404, subpt. P, App. I § 1.04.

Gruber also noted a history of alcohol abuse, with a history of hypertension, angina, cataracts, chronic pain and a haring deficit (R. 305); however, as the ALJ noted, none of these appear as treated impairments in King's medical records. Dr. Mirza–Gruber gave no indication of King having any mental impairment before his DLI of March 31, 1995. (R. 302–307).

At the administrative hearing, King gave testimony as to his then current (*i.e.,* December 2002) condition, but such testimony was of little relevance given his DLI of March 31, 1995. (R. 30–63). When asked by his representative whether he received counseling in the 1970's and 1980's for flashbacks, King responded no. (R. 62). The ALJ asked King's representative at the hearing whether there were any records that predate King's DLI of March 31, 1995, and King's representative responded, "Not that I've been able to find, Your Honor." (R. 60). The ALJ cautioned King that the record was "really skimpy" that would support his claim of disability prior to March 1995. (R. 69). Despite holding the administrative proceeding open for forty-five days to allow King to submit additional medical evidence, the only pre-March 1995 medical evidence presented to the ALJ was the February 1975 and April 1978 VA admission records. (R. 18, 60–61). Thus, the ALJ found that King had no medically determinable mental impairment before his DLI. (R. 17–18). Both Frank W. Zimmerman, M.D. and Jim L. Cox, Ph.D., state agency physicians, reached similar conclusions upon their evaluation of King's mental impairment. (R. 308–321).

To the extent King cites to *Likes v. Callahan,* for the contention that the ALJ erred in declining to consider a retrospective diagnosis of PTSD and render a retrospective assessment of its severity, this case is distinguishable. *See* 112 F.3d at 190–91. In *Likes,* two mental health professionals offered opinions that Likes suffered from chronic PTSD long before his DLI and his wife testified to Likes' poor anger control and disassociative episodes also prior to his DLI. *See Likes* 112 F.3d at 190. Here, the record does not contain evidence relating to PTSD until June 2000. (R. 18–19, 61, 246–251). Additionally, unlike *Likes,* in this case King merely testified as to his current condition and the results of his impairments rather than his condition prior to March 31, 1995. (R. 19, 30–63). Further, it appears that King's wife merely served as a witness at the administrative hearing; she did not testify as to his mental condition prior to March 31, 1995. (R. 23–24, 63). Thus, absent sufficient corroboration, lay or expert, of a retrospective diagnosis of PTSD, King's mental diagnosis or disability status after his DLI of March 31, 1995, is irrelevant to the ALJ's ruling. *See Loza v. Apfel,* 219 F.3d 378, 396 (5th Cir.2000) (retrospective evidence supported by "reports by family members, therapists and counselors of Mr. Loza's hallucinations, social withdrawal and other symptoms of PTSD and OBS before and after his insured status had lapsed"); *Likes,* 112 F.3d at 190–191 (retrospective evidence included mental health professionals' opinions and testimony from wife); *see generally Torres v. Shalala,* 48 F.3d 887, 894 n. 12 (5th Cir.1995) (degeneration of a condition after the expiration of a claimant's Title II insured status is not relevant to the Commissioner's Title II disability analysis).

The record in this case does not contain the requisite evidence needed to establish a medically determinable impairment prior to March 31, 1995. As the ALJ noted, when King was examined in 1975, "no clearly psychiatric illness was identified." (R. 17, 340). Further, a review of his 1978 records reveals vomiting from heavy drinking; there is no diagnosis of a psychiatric problem. (R. 342). Notwithstand-

# 943

ing, King's earnings records show that he worked in 1978, and that his earnings increased in subsequent years. (R. 93). The only evidence before the ALJ relating to a mental impairment was a report made in June 2000. (R. 18, 246–251). This report contained the following statements:

The veteran reported that he had about four different jobs, he worked for the VA in California for about a year and also at one of the refineries in El Segundo. He then moved back to Houston and he worked for Black Boilers Building Material for 12 years until he was laid off. He worked for Exxon in the rubber plant for eight years and he was laid off. His last job was for a liquor distributor but he stopped because of an on the job injury.

(R. 248–249). The ALJ observed that no information was in the record relating to King's "on the job injury" in 1992 or one that required King to leave his last job. (R. 18). Although the June 2000 report diagnosed King with PTSD, it did not identify that King had a medically determinable impairment stemming back prior to March 31, 1995. (R. 251).

Likewise, when King was examined in November 2000, he again was diagnosed with PTSD. (R. 344). At this session, King reported that he used to drink a "case of beer every so often plus liquor" until 1999. Contrary to King's contention, this does not establish that, prior to March 31, 1995, he had a medically determinable impairment. Similarly, in a psychiatric evaluation in November 2001, King reported that he drank two six packs of beer daily in the late 1980's and 1990's. (R. 303). The evaluation also provides:

He did not get nervous or shaky before his first drink. There were no histories of blackouts or DI's or any auditory or visual hallucinations and he did not receive any treatment for alcohol abuse of addiction and there were no legal charges or punishment due to the alcohol.

(R. 303). Although King reported a decrease in hobbies and activities, King did not indicate when the decrease began and the report does not diagnose King with a medically determinable impairment prior to March 31, 1995. (R. 302, 306). Thus, unlike the situation in *Likes,* the ALJ did not err in finding that King did not establish that a medically determinable impairment existed prior to March 31, 1995, based on the record before him.

After the close of the administrative hearing, King submitted to the Appeals Council a Mental Impairment Questionnaire dated May 28, 2003. (R. 4, 8, 348–354). As set forth by the Commissioner, the duty of the Appeals Council is to review whether or not newly submitted evidence relates to a period prior to the date of the ALJ's decision. In this regard, the regulations provide as follows:

"If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ's] hearing decision."

20 C.F.R. § 404.970(a). The Appeals Council referenced this evidence in its denial of review by stating the following:

In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council. We found this information does not provide a basis for changing the Administrative Law Judge's decision.

(R. 5–6). Although King alleges that the new evidence relates to the period of time addressed by the ALJ, there is no support for the opinion that King's impairment had existed prior to March 31, 1995. The Mental Impairment Questionnaire provides, in pertinent part:

The veteran's mental health problems began in 1970, but he became severely incapacitated in approximately 1991, and has deteriorated thereafter.

(R. 354). The Mental Health Impairment Questionnaire also stated, however, that King was first evaluated on June 22, 2000. (R. 348). As set forth above, the earlier medical records failed to establish that King had a medically determinable mental impairment prior to March 31, 1995, and the physician completing the questionnaire failed to provide any basis to support her contention that King's mental health problems began in 1970 and were incapacitating by 1991. As such, the Appeals Council properly denied review and affirmed the ALJ's decision that King had not established that he was disabled prior to March 31, 1995. *See Bradley v. Bowen,* 809 F.2d 1054, 1057 (5th Cir.1987) ("[t]he [Commissioner] is free to reject the opinion of any physician when the evidence supports a contrary conclusion").

Consequently, taking into consideration all of the above factors, the ALJ properly found in this case that King was not under a "disability" at any time on or before March 31, 1995, his date last insured. (R. 21).

### F. Residual Functional Capacity

■ Under the Act, a person is considered disabled:

… only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. …

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow her to perform work in the national economy. *See Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *see also Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 216; *Myers,* 238 F.3d at 619; *Greenspan,* 38 F.3d at 236. If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that he cannot perform the alternate work suggested. *See Masterson,* 309 F.3d at 272; *Boyd,* 239 F.3d at 705; *Shave,* 238 F.3d at 594; *Carey v. Apfel,* 230 F.3d 131, 135 (5th Cir.2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed. *See Moore v. Sullivan,* 895 F.2d 1065, 1068 (5th Cir.1990); *see also* 20 C.F.R. § 404.1545. This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan,* 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.,* 782 F.2d 1223, 1225 (5th Cir.1986); *see also* 20 C.F.R. § 404.1545. When a claimant's residual functional capacity is not sufficient to permit him to continue his former work, then his age, education, and work experience must be considered in evaluating whether he is capable of performing any other work. *See Boyd,* 239 F.3d at 705; 20 C.F.R. § 404.1520. The testimony of a vocational expert is valuable in this regard, as "[he] is familiar with the specific requirements of a particular occupation, including working conditions and

the attributes and skills needed." *Fields v. Bowen,* 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey,* 230 F.3d at 145; *see also Vaughan v. Shalala,* 58 F.3d 129, 132 (5th Cir.1995).

 In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers,* 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.* In *Myers,* the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id.* In that case, the court explained:

First, SSR 96–8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work.... RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. ... The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474–01 (July 2, 1996). The court further commented:

Second, SSR 96–9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities.... The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96–9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.* To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis. *See Carter v. Heckler,* 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Mathews,* 545 F.2d 975, 977–78 (5th Cir.1977)).

In the case at bar, the ALJ found that King retained, as of March 1995 and at all times after 1990, when King stopped work, through March 1995, the residual functional capacity for at least the full range of medium work. (R. 19). The ALJ observed the following:

Claimant could then lift and carry 50 lbs. Occasionally and 20 lbs. frequently, with pushing and pulling the same. Claimant

could then stand, and walk and sit for 6 hours in a usual work-day, with normal breaks. Claimant had no identifiable postural or manipulative limitations. Claimant had then no other limitations at all—and he had no mental limitations either.

(R. 19). The ALJ relied upon expert testimony from a VE in reaching his determination that King's past relevant work was as an operator at an oil refinery and fork-lift operator were both classified as semi-skilled jobs, each performed as medium work. (R. 20, 64–65). ALJ noted that King did not disagree as to the requirements of his fork-lift operator job, and that King's evidence as to his operator job was not entirely credible. Specifically, the ALJ found that King's description of his operator job (lifting and carrying all day but also requiring kneeling 6 hours every day) was exaggerated. (R. 20, 113). The ALJ further noted that King did not leave his operator job because he could no longer perform the work, but, instead, he reported he was laid off from this job. (R. 20, 248–249). The ALJ observed that the VE testified that based upon King's RFC, King could have returned in March 1995 to his past relevant work as an operator in an oil refinery and a fork lift operator. (R. 20, 64–68).

■■■■■ Despite King's representative failing to ask a single question of the VE at the administrative hearing (aside from confirming the contents of a hypothetical previously asked by the ALJ)(R. 68), King now maintains that his left leg displayed atrophy, tenderness and decreased sensation in 1992, showing that the ALJ "failed to make the reasonable and quite logical connection between those pre-DLI findings and the related compromise of the plaintiff's functional abilities." Docket Entry No. 13., at 8. King's contention is nothing more than supposition, as the mere fact that a condition is identified or diagnosed does not establish a disability;

the proper focus in assessing a claim of disability is the degree of functional impairment attributable to a medically determinable impairment. *See . Hames,* 707 F.2d at 165. A review of the 1992 report by Dr. Coleman provides support for the ALJ's assessment of an RFC for medium work. The report noted, "[King] is unemployed and states that his activities of daily living, particularly in lifting and sustaining his lifting of heavy objects is severely compromised." (R. 283). Dr. Coleman described King's shrapnel wounds as "moderately symptomatic" and his degenerative arthritis in King's back as "mildly symptomatic." (R. 284). Moreover, as the ALJ observed, prior to March 31, 1995, King only held a 10% VA disability rating for his shrapnel wounds. (R. 19, 170–177, 285–286). Thus, based on King's activities and the VA disability rating at that time, there was substantial evidence to support the ALJ's finding that King could perform medium work.

King also argues that the ALJ erred because he did not address whether King could sustain work. *See* Docket Entry No. 13, at 8. In *Watson v. Barnhart,* the ALJ found that the claimant had a severe degenerative disc disease, but was not disabled and had an exertional capacity for medium work. *Watson v. Barnhart,* 288 F.3d 212, 218 (5th Cir.2002). The claimant in that case argued that the ALJ erred in failing to make a determination that he could maintain employment and the Fifth Circuit agreed. *See id.* This issue, however, was revisited by the Fifth Circuit in *Frank v. Barnhart,* 326 F.3d 618 (5th Cir. 2003). In *Frank,* the Fifth Circuit clarified that "nothing in *Watson* suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case." *Id.* at 619. The Fifth Circuit further explained:

> . . . *Watson* required the ALJ to make a finding as to the claimant's ability to

maintain a job for a significant period of time, notwithstanding the exertional, as opposed to non-exertional (*e.g.*, mental illness) nature of the claimant's alleged disability. *Watson* requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms. For example, if Frank had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination. At bottom, *Watson* holds that in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time. An ALJ may explore this factual predicate in connection with the claimant's physical diagnosis as well as in the ability-to-work determination. Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment. Nevertheless, an occasion may arise, as in *Watson*, where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required. Frank did not establish the factual predicate required by *Watson* to necessitate a separate finding in this regard.

*Id.* at 619–20.

■ Furthermore, the Fifth Circuit also noted that inherent in the definition of RFC is the understanding that the claimant can maintain work at the level of the RFC. *See Dunbar v. Barnhart*, 330 F.3d 670, 671 (5th Cir.2003). Therefore, absent evidence that a claimant's ability to maintain employment would be compromised despite his ability to perform employment

as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular basis was inherent in the definition of RFC, the Fifth Circuit does not require a specific finding that a claimant can maintain employment. *See id.*

In the case at bar, King did not allege that he could not work for short periods of time but rather alleged that he could not work at all. Consequently, the ALJ was not required to make a separate finding regarding King's ability to maintain employment. As such, taken as a whole, there is sufficient evidence in the record including expert testimony to show that the ALJ properly assessed King's residual functional capacity.

## III. *Conclusion*

Accordingly, it is therefore

**ORDERED** that King's Motion for Summary Judgment (Docket Entry No. 12) is **DENIED.** It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No 14) is **GRANTED.** It is finally

**ORDERED** that the Commissioner's decision denying King disability benefits is **AFFIRMED.**

### *FINAL JUDGMENT*

In accordance with the Memorandum and Order issued this day, it is hereby

**ORDERED** that Plaintiff Sam S. King's Motion for Summary Judgment (Docket Entry No. 12) is **DENIED.** It is further

**ORDERED** that the Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration, Motion for Summary Judgment (Docket Entry No. 14) is **GRANTED.** It is finally

**ORDERED** that this matter is DIS-MISSED WITH PREJUDICE.